1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

11  RICHARD HERNANDEZ,                  ) 1:12-cv—00125-AWI-SKO-HC
                                        )
12              Petitioner,             ) FINDINGS AND RECOMMENDATION TO
                                        ) DISREGARD PETITIONER'S MOTION TO
13                                      ) VACATE EXCEPT AS A SUR-REPLY TO
          v.                            ) RESPONDENT'S MOTION TO DISMISS
14                                      ) (DOC. 18)
    WARDEN M. D. BITER,                 )
15                                      ) FINDINGS AND RECOMMENDATIONS RE:
                Respondent.             ) RESPONDENT'S MOTION TO DISMISS
16                                      ) THE PETITION (DOCS. 15, 1)
    _____ )
17                                        FINDINGS AND RECOMMENDATIONS TO
                                          GRANT RESPONDENT'S MOTION TO
18                                        DISMISS THE PETITION (DOC. 15),
                                          DISMISS THE PETITION AS UNTIMELY
19                                        FILED (DOC. 1), ENTER JUDGMENT
                                          FOR RESPONDENT, AND DECLINE TO
20                                        ISSUE A CERTIFICATE OF
                                          APPEALABILITY
21

22        Petitioner is a state prisoner proceeding pro se and in

23  forma pauperis with a petition for writ of habeas corpus pursuant

24  to 28 U.S.C. § 2254 that was filed on January 27, 2012 (doc. 1).

25  The matter has been referred to the Magistrate Judge pursuant to

26  28 U.S.C. § 636(b)(1) and Local Rules 302 and 304.  Pending

27  before the Court is Respondent's motion to dismiss the petition

28  as untimely, which was filed on August 3, 2012, along with

1

supporting documentary exhibits, and served by mail on Petitioner on the same date.  On August 24, 2012, Petitioner filed an opposition and served it on Respondent by mail.  (Doc. 17, 7.)[1] On September 14, 2012, Respondent filed a reply and served it on Petitioner by mail. (Doc. 19, 5.)

I.  <u>Disregarding Petitioner's Motion to Vacate</u>

Petitioner filed a motion to vacate a void judgment on August 24, 2012, at the same time that he filed his opposition to Respondent's motion to dismiss.  In the motion, Petitioner asked for an order to vacate an unidentified, void judgment pursuant to Fed. R. Civ. P. 60(b)(4); to deny the motion to dismiss; and to dismiss Respondent's answer because it did not dispute violations of constitutionally protected laws, which Petitioner contends causes Petitioner to be entitled to relief on the merits of his petition.  (Doc. 18.)

In support of the motion to vacate, Petitioner declared under penalty of perjury that he had witnessed unspecified agents of the prosecutor, police, and defense counsel for Petitioner and his co-defendant "knowingly coerce" his co-defendant with a bribe of a plea deal to offer perjured testimony against Petitioner to

---

[1] Under the mailbox rule, a prisoner's pro se habeas petition or other paper to be filed is "deemed filed when he hands it over to prison authorities for mailing to the relevant court." <u>Huizar v. Carey</u>, 273 F.3d 1220, 1222 (9th Cir. 2001); <u>Houston v. Lack</u>, 487 U.S. 266, 276 (1988); <u>see</u> Rule 3(d) of the Rules Governing Section 2254 Cases in the United States District Courts (Habeas Rules).  The mailbox rule applies to federal and state petitions alike.  <u>Campbell v. Henry</u>, 614 F.3d 1056, 1058-59 (9th Cir. 2010) (citing <u>Stillman v. LaMarque</u>, 319 F.3d 1199, 1201 (9th. Cir. 2003), and <u>Smith v. Ratelle</u>, 323 F.3d 813, 816 n.2 (9th Cir. 2003)).  It has been held that the date the petition is signed may be inferred to be the earliest possible date an inmate could submit his petition to prison authorities for filing under the mailbox rule.  <u>Jenkins v. Johnson</u>, 330 F.3d 1146, 1149 n.2 (9th Cir. 2003), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u>, <u>Pace v. DiGuglielmo</u>, 544 U.S. 408 (2005).  Here, the date of signature will be considered to be the date of filing.

secure the tainted conviction and sentence challenged in
Petitioner's petition.  Further, unspecified trace evidence in
"the vehicle related to this case" was deliberately and knowingly
destroyed pursuant to the order of detectives and Petitioner's
defense counsel to strip him of an available defense that could
have proved there was no evidence of an overt act on Petitioner's
part or evidence connecting him to the murder of the victim.
(Doc. 18, 2.)

Respondent filed an opposition to the motion on September
27, 2012, in which Respondent argued that Petitioner's motion was
premature.

Preliminarily, the Court notes that although Petitioner
addresses an answer and asks this Court to dismiss Respondent's
answer to the petition, no answer has been filed by Respondent in
this action.

Fed. R. Civ. P. 60(b)(4) provides as follows:

On motion and just terms, the court may relieve a party
or its legal representative from a final judgment, order,
or proceeding for the following reasons:
...
4) the judgment is void....

Further, Rule 60(c)(1) expressly provides that a motion
under Rule 60(b) must be made within a reasonable time, and for
the first three reasons (not pertinent here), no more than a year
after the entry of the judgment or order or the date of the
proceeding.  Thus, the rule expressly applies to relief sought
from a final judgment or order, and it is not contemplated that
such a motion would be made before the entry of judgment or the
final order.
///

1   No final judgment or order has been entered in the present

2   case.  Accordingly, Petitioner's motion to vacate the judgment

3   was prematurely filed.  It will be recommended that Petitioner's

4   motion to vacate a judgment be disregarded except as supplemental

5   opposition to Respondent's motion to dismiss the petition.

6       II.   <u>Proceeding by a Motion to Dismiss</u>

7        Respondent has filed a motion to dismiss the petition on

8   the ground that Petitioner filed his petition outside of the one-

9   year limitation period provided for by 28 U.S.C. § 2244(d)(1).

10      Rule 4 of the Rules Governing Section 2254 Cases in the

11  United States District Courts (Habeas Rules) allows a district

12  court to dismiss a petition if it "plainly appears from the face

13  of the petition and any exhibits annexed to it that the

14  petitioner is not entitled to relief in the district court...."

15      The Ninth Circuit has allowed respondents to file motions to

16  dismiss pursuant to Rule 4 instead of answers if the motion to

17  dismiss attacks the pleadings by claiming that the petitioner has

18  failed to exhaust state remedies or has violated the state's

19  procedural rules.  <u>See</u>, <u>e.g.</u>, <u>O'Bremski v. Maass</u>, 915 F.2d 418,

20  420 (9th Cir. 1990) (motion to dismiss a petition for failure to

21  exhaust state remedies); <u>White v. Lewis</u>, 874 F.2d 599, 602-03

22  (9th Cir. 1989) (motion to dismiss for state procedural default);

23  <u>Hillery v. Pulley</u>, 533 F.Supp. 1189, 1194 & n.12 (E.D.Cal. 1982)

24  (same).  Thus, a respondent may file a motion to dismiss after

25  the Court orders the respondent to respond, and the Court should

26  use Rule 4 standards to review a motion to dismiss filed before a

27  formal answer.  <u>See</u>, <u>Hillery</u>, 533 F. Supp. at 1194 & n.12.

28  ///

4

Here, Respondent's motion to dismiss addresses the untimeliness of the petition pursuant to 28 U.S.C. 2244(d)(1). The material facts pertinent to the motion are contained in copies of the official records of state judicial proceedings which have been provided by Respondent and Petitioner, and as to which there is no factual dispute.  Because Respondent has not filed a formal answer, and because Respondent's motion to dismiss is similar in procedural standing to a motion to dismiss for failure to exhaust state remedies or for state procedural default, the Court will review Respondent's motion to dismiss pursuant to its authority under Rule 4.

III.  <u>Background</u>

On April 18, 2006, in case number F04906535-0 in the Superior Court of the State of California, County of Fresno (FCSC), Petitioner was convicted of two counts of murder of a woman and her unborn child.  On May 30, 2006, Petitioner was sentenced to two terms of life without the possibility of parole, enhanced by two terms of twenty-five years each for the personal use of a firearm pursuant to Cal. Pen. Code § 12022.53(d).  (LD 1, LD 2 at 2.)[2]

On October 23, 2008, the Court of Appeal of the State of California, Fifth Appellate District (CCA) affirmed the judgment on appeal and ordered that a parole revocation fine be stricken. (LD 2, 17.)

On December 9, 2008, Petitioner filed a petition for review in the California Supreme Court (CSC).  (LD 3.)  On January 14,

---

[2] "LD" refers to documents lodged by Respondent in support of the motion to dismiss.

5

1  2009, the CSC denied the petition for review without a statement
2  of reasoning or citation of any authority.  (LD 4.)

3      On April 8, 2010, Petitioner filed in the FCSC a petition
4  for writ of habeas corpus.[3]  (LD 5.)  On June 17, 2010, the FCSC
5  denied the petition, explaining that Petitioner failed to state a
6  prima facie case for relief with respect to his challenges to his
7  convictions; further, some of his challenges could have been
8  raised on appeal and thus would not be considered on habeas
9  corpus.  (LD 6, 1-7.)  Attached to the order of denial is a
10 certification and declaration under penalty of perjury of a
11 deputy clerk of the FCSC that on June 17, 2010, a copy of the
12 order denying the petition was mailed to Petitioner.  (Id. at 8.)
13 Petitioner declared in his petition for writ of habeas corpus
14 subsequently filed in the CCA that he received notice of the
15 FCSC's denial of his habeas petition on July 12, 2010, via the
16 prison mail system at Kern Valley State Prison (KVSP).

17     On November 2, 2010, Petitioner filed a petition for writ of
18 habeas corpus in the CCA.  (LD 7, petition form at p. 6, and last
19 page.)  On February 17, 2011, the CCA denied the petition without
20 a statement of reasoning or citation of authority.  (LD 8.)

21     On November 8, 2011, Petitioner filed a petition for writ of
22 habeas corpus in the CSC.  (LD 9, petition form p. 6.)  On
23 December 1, 2011, the CSC marked "received" a supplemental
24 petition for writ of habeas corpus.  On March 28, 2012, the CSC

25
26
27 [3] The Court will apply the mailbox rule in calculating the date of filing and where possible will rely on the date the Petitioner signed a document as the date of filing.  Jenkins v. Johnson, 330 F.3d 1146, 1149 n.2 (9th Cir. 2003), overruled on other grounds, Pace v. DiGuglielmo, 544 U.S. 408 (2005).
28

6

denied the petition for writ of habeas corpus without a statement of reasons or citation of authority.  (LD 10.)

A search of the official website of the California courts reflects that no other post-trial petitions were filed by Petitioner in the CCA or CSC that corresponded with the pertinent convictions.[4]

Petitioner filed his petition in this Court on January 27, 2012.  (Doc. 1.)  Because the petition is undated (id. at 8), and there is no other indication of when it was turned over to prison authorities for mailing, the date of filing is the date on which the Court received the document for filing.  (Doc. 1.)

IV. <u>Limitation Period for Filing a Petition for Writ of Habeas Corpus</u>

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  The AEDPA applies to all habeas petitions filed after the enactment of the AEDPA. <u>Lindh v. Murphy</u>, 521 U.S. 320, 327 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc), <u>cert. denied,</u> 118 S.Ct. 586 (1997).  Petitioner filed his original petition for writ of habeas corpus on or about January 27, 2012.  Thus, the AEDPA applies to the petition.

The AEDPA provides a one-year period of limitation in which a petitioner must file a petition for writ of habeas corpus.  28

---

[4] The Court may take judicial notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, including undisputed information posted on official websites.  Fed. R. Evid. 201(b); <u>United States v. Bernal-Obeso</u>, 989 F.2d 331, 333 (9th Cir. 1993); <u>Daniels-Hall v. National Education Association</u>, 629 F.3d 992, 999 (9th Cir. 2010).  It is appropriate to take judicial notice of the docket sheet of a California court.  <u>White v Martel</u>, 601 F.3d 882, 885 (9th Cir. 2010), <u>cert. denied</u>, 131 S.Ct. 332 (2010).  The address of the official website of the California state courts is www.courts.ca.gov.

U.S.C. § 2244(d)(1).  As amended, subdivision (d) reads:

> (1)  A 1-year period of limitation shall apply to
> an application for a writ of habeas corpus by a person
> in custody pursuant to the judgment of a State court.
> The limitation period shall run from the latest of –

>> (A) the date on which the judgment became
>> final by the conclusion of direct review or the
>> expiration of the time for seeking such review;

>> (B) the date on which the impediment to
>> filing an application created by State action in
>> violation of the Constitution or laws of the United
>> States is removed, if the applicant was prevented from
>> filing by such State action;

>> (C) the date on which the constitutional right
>> asserted was initially recognized by the Supreme Court, if
>> the right has been newly recognized by the Supreme Court and
>> made retroactively applicable to cases on collateral review;
>> or

>> (D) the date on which the factual predicate
>> of the claim or claims presented could have been
>> discovered through the exercise of due diligence.

> (2) The time during which a properly filed
> application for State post-conviction or other
> collateral review with respect to the pertinent
> judgment or claim is pending shall not be counted
> toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

V.   <u>Commencement of the Running of the Statute</u>

Here, pursuant to § 2244(d)(1)(A), the limitation period

runs from the date on which the judgment became final.  The term

"judgment" refers to the sentence imposed on the petitioner.

<u>Burton v. Stewart</u>, 549 U.S. 147, 156-57 (2007).  The last

sentence was imposed on Petitioner on May 30, 2006.

Pursuant to § 2244(d)(1)(A), a judgment becomes final either

upon the conclusion of direct review or the expiration of the

time for seeking such review in the highest court from which

review could be sought.  <u>Wixom v. Washington</u>, 264 F.3d 894, 897

1   (9th Cir. 2001).

2      The statute commences to run pursuant to § 2244(d)(1)(A)

3 upon either 1) the conclusion of all direct criminal appeals in

4 the state court system, followed by either the completion or

5 denial of certiorari proceedings before the United States Supreme

6 Court; or 2) if certiorari was not sought, then by the conclusion

7 of all direct criminal appeals in the state court system followed

8 by the expiration of the time permitted for filing a petition for

9 writ of certiorari. Wixom, 264 F.3d at 897 (quoting Smith v.

10 Bowersox, 159 F.3d 345, 348 (8th Cir. 1998), cert. denied, 525

11 U.S. 1187 (1999)). Neither party has indicated that Petitioner

12 sought certiorari from the United States Supreme Court.

13      Here, Petitioner's direct criminal appeals in the state

14 court system concluded when his petition for review was denied by

15 the California Supreme Court on January 14, 2009. The time

16 permitted for seeking certiorari was ninety days. Supreme Court

17 Rule 13; Bowen v. Roe, 188 F.3d 1157, 1159 (9th Cir. 1999).

18      The Court will apply Fed. R. Civ. P. 6(a) in calculating the

19 pertinent time periods. See, Waldrip v. Hall, 548 F.3d 729, 735

20 n.2 (9th Cir. 2008), cert. denied, 130 S.Ct. 2415 (2010).

21 Applying Fed. R. Civ. P. 6(a)(1)(A), the day of the triggering

22 event is excluded from the calculation. Thus, the ninety-day

23 period commenced on January 15, 2009, the day following the

24 California Supreme Court's denial of review. Applying Fed. R.

25 Civ. P. 6(a)(1)(B), which requires counting every day, the

26 ninetieth day was April 14, 2009. Thus, the time for seeking

27 direct review expired on that date.

28 ///

1    Accordingly, the limitations period began to run on April

2   15, 2009, the day following the expiration of the time for

3   seeking certiorari and, absent any basis for tolling, concluded

4   one year later on April 14, 2010.  Fed. R. Civ. P. 6(a);

5   Patterson v. Stewart, 251 F.3d 1243, 1245-46 (9th Cir. 2001)

6   (the correct method for computing the running of the one-year

7   grace period after the enactment of AEDPA is pursuant to Fed. R.

8   Civ. P. 6(a), in which the day upon which the triggering event

9   occurs is not counted).

10       VI.   Statutory Tolling

11       Title 28 U.S.C. § 2244(d)(2) states that the "time during

12  which a properly filed application for State post-conviction or

13  other collateral review with respect to the pertinent judgment or

14  claim is pending shall not be counted toward" the one-year

15  limitation period.  28 U.S.C. § 2244(d)(2).  Once a petitioner is

16  on notice that his habeas petition may be subject to dismissal

17  based on the statute of limitations, he has the burden of

18  demonstrating that the limitations period was sufficiently tolled

19  by providing the pertinent facts, such as dates of filing and

20  denial.  Zepeda v. Walker, 581 F.3d 1013, 1019 (9th Cir. 2009)

21  (citing Smith v. Duncan, 297 F.3d 809, 814-15 (9th Cir. 2002),

22  abrogation on other grounds recognized by Moreno v. Harrison, 245

23  Fed.Appx. 606 (9th Cir. 2007)).

24       An application for collateral review is "pending" in state

25  court "as long as the ordinary state collateral review process is

26  'in continuance'-i.e., 'until the completion of' that process."

27  Carey v. Saffold, 536 U.S. 214, 219-20 (2002).  In California,

28  this generally means that the statute of limitations is tolled

10

from the time the first state habeas petition is filed until the California Supreme Court rejects the petitioner's final collateral challenge, as long as the petitioner did not "unreasonably delay" in seeking review. Id. at 221-23; accord, Nino v. Galaza, 183 F.3d 1003, 1006 (9th Cir. 1999). The statute of limitations is not tolled from the time a final decision is issued on direct state appeal and the time the first state collateral challenge is filed because there is no case "pending" during that interval. Id.; see, Lawrence v. Florida, 549 U.S. 327, 330-33 (2007) (time period after a state court's denial of state post-conviction relief and while a petition for certiorari is pending in the United States Supreme Court is not statutorily tolled because no application for state post-conviction or other state collateral review is pending).

In Carey v. Saffold, 536 U.S. 214, the Court held that an application is "pending" until it "has achieved final resolution through the State's post-conviction procedures." Id. at 220. An application does not achieve the requisite finality until a state petitioner "completes a full round of collateral review." Id. at 219-20. Accordingly, in the absence of undue delay, an application for post-conviction relief is pending during the "intervals between a lower court decision and a filing of a new petition in a higher court" and until the California Supreme Court denies review. Id. at 223; Biggs v. Duncan, 339 F.3d 1045, 1048 (9th Cir. 2003).

Here, on April 8, 2010, just six (6) days before the one-year limitation period otherwise would have run, Petitioner filed his petition in the FCSC. Respondent does not contend that

11

1   Petitioner's first state habeas petition was improperly filed.
2   Thus, the pendency of the habeas petition in the FCSC tolled the
3   statute from April 8, 2010, through June 17, 2010, the date on
4   which the FCSC denied the petition, for a total of seventy-one
5   (71) days.

6       If April 14, 2010, the initially calculated date of the
7   running of the statutory period, were extended by the seventy-one
8   days of tolling from the pendency of the habeas petition in the
9   FCSC, the last day of the statutory period would be June 24,
10  2010.  Petitioner's second habeas petition was not filed in the
11  CCA until November 2, 2010 – well beyond June 24, 2010.

12              A.   Delay before Filing in the CCA

13      Petitioner may contend that the statute was tolled between
14  the FCSC's denial of the habeas petition on June 17, 2010, and
15  the filing of the next habeas petition in the CCA on November 2,
16  2010.  However, Respondent contends that the statute was not
17  tolled during the gap between the two proceedings because
18  Petitioner unreasonably delayed after the denial of the FCSC
19  petition on June 17, 2010, and before filing the second state
20  habeas petition in the CCA on November 2, 2010.

21      Absent a clear direction or explanation from the California
22  Supreme Court about the meaning of the term "reasonable time" in
23  a specific factual context, or a clear indication that a filing
24  was timely or untimely, a federal court hearing a subsequent
25  federal habeas petition must examine all relevant circumstances
26  concerning the delay in each case and determine independently
27  whether the state courts would have considered any delay
28  reasonable so as to render a state collateral review petition

1  "pending" within the meaning of § 2244(d)(2).  Evans v. Chavis,

2  546 U.S. 189, 197-98 (2006).

3      The delay between the denial of the FCSC petition and the

4  filing of the habeas petition in the CCA was approximately four

5  and one-half months.  A delay of six months has been found to be

6  unreasonable because it is longer than the relatively short

7  periods of 30 or 60 days provided by most states for filing

8  appeals.  Evans v. Chavis, 546 U.S. at 201.  Shorter delays,

9  however, have been found to be unreasonable: 146 days between the

10  filing of two trial court petitions, Banjo v. Ayers, 614 F.3d

11  964, 968-69 (9th Cir. 2010), cert. den., 131 S.Ct. 3023 (2011);

12  intervals of 81 and 92 days between the disposition of a writ at

13  one level and the filing of the next writ at a higher level,

14  Velasquez v. Kirkland, 639 F.3d 964, 968 (9th Cir. 2011), cert.

15  den., 132 S.Ct. 554 (2011); unjustified delays of 115 and 101

16  days between denial of one petition and the filing of a

17  subsequent petition, Chaffer v. Prosper, 592 F.3d. 1046, 1048

18  (9th Cir. 2010); and unexplained, unjustified periods of 97 and

19  71 days, Culver v. Director of Corrections, 450 F.Supp.2d 1135,

20  1140 (C.D.Cal. 2006); see, Sok v. Substance Abuse Training

21  Facility, 2011 WL 3648474, *4-*5 (No. 1:11-cv-00284-JLT-HC,

22  E.D.Cal. Aug. 17, 2011) (163-day delay unreasonable, noting an

23  apparent consensus emerging in the district courts in California

24  that any delay of sixty days or less is per se reasonable, but

25  that any delay "substantially" longer than sixty days is

26  unreasonable).

27      Here, the CCA summarily denied the petition.  Thus, the CCA

28  did not expressly determine that the petition was untimely.  The

13

subsequent petition before the CSC was also summarily denied. However, considering only the length of the delay, the Court concludes that the delay of four and one-half months before filing a petition in the CCA was a substantial delay because it far exceeds sixty days, or the customarily short periods of delay considered reasonable.

> B.   Justification for the Delay before Filing in the California Court of Appeal

To benefit from statutory tolling, a petitioner must adequately justify a substantial delay. 28 U.S.C. § 2244(d)(2); Evans v. Chavis, 546 U.S. at 192-93; Waldrip v. Hall, 548 F.3d at 734.  As a general rule, a habeas corpus petition must be filed within a reasonable time after the petitioner or counsel knew, or with due diligence should have known, the facts underlying the claim as well as the legal basis of the claim.  In re Harris, 5 Cal.4th 813, 828 n.7 (citing In re Clark, 5 Cal.4th 750, 784 (1993)).  Under California law, a habeas "claim or sub-claim that is substantially delayed will nevertheless be considered on the merits if the petitioner can demonstrate 'good cause' for the delay." In re Robbins, 18 Cal.4th 770, 805 (1998) (citing In re Clark, 5 Cal.4th at 783).  Petitioner must show particular circumstances, based on allegations of specific facts, sufficient to justify the delay; allegations made in general terms are insufficient.  In re Robbins, 18 Cal.4th at 787-88, 805 (citing In re Walker, 10 Cal.3d 764, 774 (1974)).  The delay is measured from the time the petitioner or counsel knew, or reasonably should have known, of the factual information offered in support of the claim and the legal basis for the claim.  In re Robbins,

18 Cal.4th at 787.

As the Ninth Circuit Court of Appeals has noted, there are no standards for determining what period of time or factors constitute "substantial delay" in noncapital cases or for determining what factors justify any particular length of delay. King v. LaMarque, 464 F.3d 963, 966 (9th Cir. 2006). California's time limit for filing a habeas petition in a non-capital case is more "forgiving and flexible" than that employed by most states.  Chavis, 546 U.S. at 202 (Stevens, J., concurring).

Here, Petitioner does not expressly advance any justification for the delay.  His opposition focuses on exhaustion of state court remedies, a matter as to which no deficiency is raised in the motion to dismiss and thus a subject that is not directly before the Court.  Petitioner may be arguing that his efforts to exhaust state court remedies justified the delay.

A review of the record provided by Respondent reveals that there are significant differences between the petition filed in the FCSC and the one filed in the CCA.  The petition filed in the superior court raised essentially the same issues as the CCA petition (prosecutorial destruction of unspecified exculpatory evidence, namely, the vehicle connected with the murder; prosecutorial vouching for the credibility of witnesses; ineffective assistance of appellate counsel, including appellate counsel's failure to raise issues as well as to manage to transfer the record of the trial court proceedings to Petitioner in a timely fashion, which also involved alleged interference by

officials of the California Department of Corrections and
Rehabilitation (CDCR); and ineffective assistance of trial
counsel for failing to investigate the facts and Petitioner's
alibi, retain the vehicle, and avoid its destruction and
destruction of unspecified, related evidence).  (LD 5.)  However,
the claims were stated in a conclusional fashion, with the
factual bases of the claims often not set forth.  Further, the
legal bases of the claims were set forth very briefly without
extended argument.

In contrast, the petition filed in the CCA contained greater
factual background.  Although the precise evidence Petitioner had
hoped to have extracted from the vehicle were not identified,
Petitioner specified that evidence of bullet trajectories,
clothing, and blood could have been expected to have been found.
Petitioner included a factual background as well as legal
argument.  Further, he attached exhibits to his petition,
including a photograph of the interior of the vehicle showing its
contents before the vehicle was destroyed, and other pertinent
portions of the pretrial and trial proceedings; copies of
interviews with witnesses; a copy of a plea agreement allegedly
offered to or made with the chief prosecution witness who owned
the car in which the first shot of several that killed the victim
was fired, namely, co-participant Danial Archan; correspondence
between Petitioner's counsel and the police concerning the
anticipated destruction or release of the vehicle; documentation
of Petitioner's diligent and continuous efforts to see his trial
counsel; law enforcement detectives' declarations concerning
having found no evidence in the vehicle; and declarations of

arson and ballistics experts retained by the defense concerning what type of evidence they anticipated could have been discovered in the vehicle.

In sum, significant expansion of the petition occurred in the interval between the denial of the FCSC petition and the filing of the CCA petition.  Further, in the FCSC petition, Petitioner detailed in a declaration circumstances explaining the delay in filing the petition, including difficulty in obtaining the trial record that continued and had endured for three months, denial of access to the prison library despite having a valid court deadline, and lack of library clerks when he visited the library.  (Id. at 6 & "PG1.")

In the petition filed in the CCA, Petitioner similarly detailed circumstances explaining his delay in filing the petition.  Petitioner alleged that he had hired an investigator, who was developing unspecified new evidence that supported his petition.  Petitioner generally alleged that he had remained diligent in timely filing his pleading, provided documentation of his claim that he had continuously, and diligently requested to see counsel during the pretrial and trial proceedings but had succeeded in talking with counsel on only four occasions.  (LD 7, form petition at p. 6.)  He explained that his private investigator had a heavy caseload and had asked for a continuance past the Christmas holidays, Petitioner's new claims depended on evidence both within and without the trial court record, and he had not received the FCSC's denial of his petition until July 12, 2010 via the prison mail system.  (Id. at first non-form text pages 1-3.)  Further, Petitioner was attempting to prepare and

17

file his first petition and was at best a layman in the area of law. On August 10, 2010, Petitioner was placed into administrative segregation at Kern Valley State Prison (KVSP) and continued to be housed there when the CCA petition was filed. (Id. at 3.)  The placement resulted in the removal of all legal materials the petitioner had or to which he could obtain access until October 4, 2010, when a "small amount of the records needed were provided to me by the staff." (Id.)  This further delayed the preparation of the writ and the progress of the investigator. Petitioner offered to provide prison records to support his allegations. (Id.)

It appears that Petitioner attempted to comply with the state law requirement that a petitioner who files a petition for writ of habeas corpus must allege specific facts to explain and justify a delay. In re Clark, 5 Cal.4th at 765, 798 n.35.[5] Delay in seeking habeas corpus or other collateral relief has been measured from the time a petitioner becomes aware of the grounds on which he seeks relief. Id. at 765 n.5.  The California Supreme Court has accepted as adequate explanation and justification for a five-year delay between a conviction and filing a collateral attack on a judgment the petitioner's grade school education and inability to make use of information because he was not aware of the law when, on learning of the law, the petitioner immediately sought the assistance of counsel. Id. at

---

[5] The California Supreme Court has noted in this context that it will take judicial notice of its own records and of the prior petitions filed by or on behalf of a petitioner pursuant to Cal. Evid. Code § 452; because the record of the appeal and any prior petition is readily available to the California Supreme Court, it need not await opposition before summarily denying a petition that is successive or unreasonably delayed. In re Clark, 5 Cal.4th at 798 n. 35.)

786.  Further, a three-year delay is excused where the petitioner
had not completed the seventh grade, was not knowledgeable about
legal procedures, and diligently used the resources available to
prisoners for research and preparation of legal documents.  Id.
(citing state cases).  Thus, where a petitioner states when he
became aware of the legal and factual bases for his claims and
justifies any substantial delay in presenting the claims, a
petition may be considered timely.

Under California law, the indigence and pro se status of a
petitioner does not create an exception to the requirement of
alleging specific facts to justify substantial delay.  In re
Clark, 5 Cal.4th at 765.  Petitioner here alleged that he lacked
knowledge of the law and lacked access to his papers and to legal
resources between early August and early October.  The CCA
petition reveals that he used the trial file to augment and
document his factual allegations, and he used the law library to
add to the legal argument to the petition.

A failure to receive notification from a court that it has
ruled on a petition for writ of habeas corpus is a basis for
concluding that a delay in filing a habeas petition in the next
higher California court was not unreasonable.  Winston v. Sisto,
2008 WL 2119918, *6-*9 (No. CIV S-07-2284 JAM DAD P, E.D.Cal. May
20, 2008) (finding explained and not unreasonable, and hence
statutorily tolled pursuant to § 2244(d)(2), delay resulting from
a failure to receive a notice of a ruling until July 2005 with
respect to a petition filed in December 2004 and denied in April
2005, where the Petitioner was transferred, the evidence
supported a conclusion that he filed a notice of change of

19

address, and he requested notice of the ruling in April 2005).
Here, Petitioner had approximately one month after receiving the
FCSC's denial of his petition on July 12, 2010, until he was
placed in administrative segregation, where he had no access to
legal materials for approximately two months, and then had only
limited access for approximately a month thereafter before filing
the petition in the CCA on November 2, 2010.

Petitioner did not specify when he received all his records,
or which records he included in the CCA petition from the small
amount of records provided to him by staff on October 4, 2010.
Nevertheless, considering the extensive amplification and
documentation of Petitioner's petition in the CCA, and given the
short period of time when Petitioner had knowledge of the FCSC's
denial of his petition and access to his legal materials before
the filing of the CCA petition, the Court cannot conclude that if
the California courts had considered the issue, they would have
determined that any substantial delay in filing the habeas
petition in the CCA was not justified. Cf., Bui v. Hedgpeth, 516
F.Supp.2d 1170, 1175-76 (C.D.Cal. 2007) (pro se petitioner was
entitled to "gap tolling" for a period of 83 days where during
the pertinent time, he substantially revised and augmented a
prior trial court petition, adding multiple new grounds for
relief, and for another period of 158 days where he suffered
restricted access to the law library to make required copies of
the petition); Roeung v. Felker, 484 F.Supp.2d 1081, 1083-85
(C.D.Cal. 2007) (pro se petitioner was entitled to "gap tolling"
for a six-month delay between the trial court's denial of a
habeas petition and filing a petition in the court of appeal

because of a lengthy record, complex issues, Petitioner's having conducted further legal research revealing additional grounds for relief, and his substantial augmentation and rewriting of the trial court petition); Haynes v. Carey, 2007 WL 3046008, *2-*6 (No. CIV S-07-0484 LKK DAD P, E.D.Cal. Oct. 18, 2007) (pro se petitioner was entitled to "gap tolling" for a 170-day delay between denial of a petition and filing in the next higher court where the respondent did not reply to Petitioner's contentions that he was delayed because he suffered limited access to the law library due to closures and lock-downs, meetings of staff in prison, training, and irregular schedules).

Here, although Respondent provided this Court with the state court records reflecting petitioner's habeas petitions, Respondent did not address how the contents of those petitions reflected explanations or justification for any delays in the filing of the petitions. The court concludes that Petitioner provided sufficient explanation to the California courts to justify his 138-day delay in filing a petition in the CCA. Therefore, the entire time during which the petition was pending in the CCA (November 2, 2010, through February 17, 2011) was statutorily tolled. Further, the "gap" or time after the FCSC's denial on June 17, 2010, until the filing of the CCA petition on November 2, 2010, was likewise subject to statutory tolling on the ground that a petition was pending.

C.   Delay before Filing in the California Supreme Court

Petitioner delayed for 263 days, or almost nine months, after the CCA's denial of his petition on February 17, 2011, and

the filing of his petition in the CSC on November 8, 2011.  This period of time far exceeds thirty or sixty days, the customarily short periods of delay considered reasonable.

D.  <u>Justification for the Delay before Filing in the California Supreme Court</u>

Again, Petitioner does not expressly argue that he was entitled to statutory tolling during that time period. Petitioner's opposition focuses on exhaustion of state court remedies, which has not been shown to be by itself a sufficient explanation or justification for a substantial delay.

However, reference to the state court records provided by Respondent in support of the motion reflects that the petition filed in the CSC was essentially the same as the petition filed in the CCA.  (LD 7, LD 9.)  The statements of the grounds and the facts of the claims were virtually identical, with the addition of a few words to the heading of the second ground and a formal prayer for relief.

Although a supplemental petition was marked "received" by the CSC on December 1, 2011, it is not clear that the supplement was filed or considered by the state court.  Further, it is not clear that any concern related to these claims caused any delay in initially filing the habeas petition in the CSC.

Further, many of the six additional claims set forth in the supplement were not new.[6]  For example, one supplemental claim contended that because the conviction was supported by the sole testimony of an accomplice without independent corroboration,

---

[6] Indeed, in the supplement, Petitioner incorporated the facts stated in the original petition for the grounds stated therein.  (LD 9, supp. pet. rec'd. Dec. 1, 2011, at 12.)

22

Cal. Pen. Code § 1111 had been violated.  However, in the CCA's decision on appeal, the CCA had addressed a related contention concerning an issue of whether or not Archan was an accomplice as a matter of law and whether the instructions given on accomplice testimony were correct.  In the course of addressing this issue, the CCA reviewed § 1111, analyzed the trial evidence, and concluded that there was sufficient corroboration in the record to satisfy the requirement in § 1111 of corroboration of Archan's testimony.  (LD 2, 10-12.)  Thus, both the legal and factual grounds of the claim were apparent at the time the appeal was determined.

Two additional claims alleged in the supplement were closely related, namely, that there was insufficient evidence of an overt act on Petitioner's part to commit the murder independent of Archan's testimony, and that the conviction was based on speculation or assumptions absent corroboration of the accomplice testimony.  The CCA's opinion appears to dispose of these claims because it concluded that Archan's testimony was sufficiently corroborated.  The opinion also noted that there were multiple sources of evidence of Petitioner's guilt, and it characterized the evidence of Petitioner's guilt as overwhelming.  (LD 2, 10-12, 15 n.7.)  It thus does not appear that the purported discovery of these claims long after the appeal was decided could explain or justify a delay of nearly nine months in filing the petition.

Petitioner alleged in the supplement that the prosecution obtained the conviction by means of perjured testimony of officers who declared under penalty of perjury that the vehicle

1   had been inspected but nothing of evidentiary value had been

2   discovered other than glass, and that Petitioner's counsel had

3   agreed that the car could be released.  However, the officers'

4   declarations were before the CCA.  (LD 7, exh. 2.)  Further, in

5   the petitions filed in the CCA and CSC, Petitioner detailed the

6   duty of the prosecutor to test the veracity of Archan and the

7   falsity of his testimony, and the petition referenced the

8   declarations of the officers in this context.  (See, e.g., LD 7,

9   ground 1, text pp. 1-10.)  Even if the precise legal basis for

10  the supplemental claim was not included in the earlier petitions,

11  it does not appear that such a discovery could justify the

12  lengthy delay in the present case.

13      Petitioner also alleged in the supplement received by the

14  CSC that the trial record lacked any evidence that Archan had

15  provided reliable information to the prosecution in the past, and

16  thus he did not have the background to qualify as an informant.

17  However, as with the preceding claim, in view of the inclusion in

18  previous petitions of extensive material regarding inconsistent

19  and false statements given by Archan, the delayed discovery of a

20  legal basis for the supplemental claim concerning his

21  unreliability could not justify the extended delay in question.

22  Further, any asserted absence of a history of Archan's having

23  served as an informant would not provide any legal basis to

24  undermine Archan's status as an eyewitness to the events about

25  which he testified.

26      Accordingly, the Court concludes that Petitioner has not

27  provided justification or good cause for the substantial delay

28  between the denial of the CCA petition and his filing of the CSC

24

petition.

E.   Actual Innocence Exception

Petitioner's final claim in the supplemental petition was that he was factually innocent of the crime.  Petitioner contended that Cal. Pen. Code § 1111 was violated because of the absence of independent evidence to corroborate his connection to the murder.  Petitioner asserted that absent from the evidence introduced at trial was testimony of Archan that Archan had participated in dragging the injured, pregnant victim out of the car before the Petitioner shot her again because Archan assumed he would be harmed if he did not cooperate.  Petitioner further asserted that defense photographs demonstrated that there was evidence in the car, which contradicted the officers' perjured declarations, and that Petitioner was willing to testify under oath that he was factually innocent.  (LD 9, supp. pet., 11.)

1.   Legal Standards

In In re Reno, - Cal.4th -, 146 Cal.Rptr.3d 297, 328-29 (2012), the California Supreme Court summarized the governing law as follows:

> Our rules establish a three-level analysis for assessing whether claims in a petition for a writ of habeas corpus have been timely filed. First, a claim must be presented without substantial delay. Second, if a petitioner raises a claim after a substantial delay, we will nevertheless consider it on its merits if the petitioner can demonstrate good cause for the delay. Third, we will consider the merits of a claim presented after a substantial delay without good cause if it falls under one of four narrow exceptions: "(i) that error of constitutional magnitude led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner; (ii) that the petitioner is actually innocent of the crime or crimes of which he or she was convicted; (iii) that the death penalty was imposed by a sentencing authority that had such a grossly

25

misleading profile of the petitioner before it that,
absent the trial error or omission, no reasonable judge
or jury would have imposed a sentence of death; or (iv)
that the petitioner was convicted or sentenced under an
invalid statute." *(In re Robbins, supra*, 18 Cal.4th at
pp. 780-781, 77 Cal.Rptr.2d 153, 959 P.2d 311.) The
petitioner bears the burden to plead and then prove all
of the relevant allegations. (*Ibid.*)

In re Reno, 146 Cal.Rptr.3d at 328-29.

When California courts apply actual innocence as an
exception to the untimeliness bar, they do so exclusively by
reference to state law.  In re Robbins, 18 Cal.4th at 811.  To
establish this exception, a petitioner must show that the
purported evidence of innocence undermines the entire prosecution
case and points unerringly to innocence or reduced culpability.
Id. at 812.  New evidence that is merely relevant to an issue
already disputed at trial which does no more than conflict with
trial evidence is not sufficient to undermine the judgment.  In
re Clark, 5 Cal.4th at 798 n.33.  It is not sufficient that the
evidence might have raised a reasonable doubt as to guilt;
rather, the petitioner must establish actual innocence, a
standard that cannot be met with evidence that a reasonable jury
could have rejected.  Id.  The petitioner bears a heavy burden of
satisfying the court that the evidence of innocence could not
have been, and presently cannot be, refuted.  Id.

### 2.  Factual Background

The facts of Petitioner's offenses were set forth in the
decision of the CCA (LD 2, 2-9) and will be briefly summarized to
permit consideration of whether Petitioner's purported evidence
of innocence undermines the entire prosecution case and points
unerringly to innocence or reduced culpability.

The testimony of Daniel Archan, Jr., was the only testimony
of a witness to Petitioner's conduct in shooting the victim and
participating in the burning of the car connected to the
homicide.  Petitioner and the victim, America Gonzalez, had been
in a romantic relationship for about two years and had a
daughter.  Archan testified he picked up Petitioner in Archan's
car on the afternoon of September 21, 2004; they smoked
methamphetamine, marijuana, and drank beer.  At Petitioner's
request, Archan took Petitioner to Gonzalez's apartment, where
Petitioner, who seemed angry and anxious, entered and exited
several times and came out with their daughter, whom the men
delivered to Petitioner's mother's house.

The men returned to Gonzalez's apartment at about 8:00 or
9:00 p.m., where Petitioner brought Gonzalez out to the car.
Archan drove them to Petitioner's mother's house, where
Petitioner and Gonzalez visited briefly and then returned to the
car.  Archan took Petitioner to the house of a friend and waited
for Petitioner to come out.  Archan and Petitioner smoked more
methamphetamine and drank more beer in an area near some
vineyards.  Gonzalez remained in the back seat, drinking a beer.

Petitioner exited the vehicle to relieve himself.  He pulled
out a two-barreled shotgun which had been hidden in Petitioner's
pocket or the side of Petitioner's seat.  Petitioner, who was
wearing white gloves, moved the passenger's seat forward, pointed
the shotgun at Gonzalez, and started calling her names.  When
Archan tried to calm Petitioner, Petitioner pointed the gun at
Archan and fired, which caused the pellets to go through the
window of the driver's side door.  When Archan got out of the car

1    and again tried to calm Petitioner, Archan was so scared he

2    urinated on the ground.   Petitioner pointed the gun at Gonzalez,

3    threatened to shoot her, tried to pull her out of the car by her

4    feet when she refused his command to exit, hit her with the gun,

5    and then shot into the car.   Archan observed Gonzalez hunched

6    over, rapidly moving her hands and making a retching noise.

7        Archan followed Petitioner's order to drag Gonzalez out of

8    the car after Petitioner threatened to shoot him if he failed to

9    follow orders.   Petitioner then ordered Archan to start the car

10   and pointed the shotgun at Gonzalez; Archan heard two more shots

11   from the shotgun.

12       Petitioner directed Archan to a location where Petitioner

13   had Archan turn off the car; Petitioner put a rag into the gas

14   tank and lit it.   Eventually the car burned.   The two went to a

15   trailer house they had visited earlier in the day, where

16   Petitioner told the two occupants that he had killed someone.

17   One man took Petitioner's gun and put it underneath the trailer

18   house; the other gave Archan and Petitioner a ride to Selma.   An

19   attempt at burning the clothes was not successful.   Petitioner

20   and Archan arrived at a house where Petitioner obtained clothes

21   for them to wear.   Upon being transported to Petitioner's

22   brother's house, Petitioner told his brother that he had killed

23   Gonzalez.   The brother took them to the Licons' house, where

24   Petitioner stated that they had been in a fight with some men who

25   had stolen Archan's vehicle.   Archan called police to report a

26   stolen vehicle.

27       Archan initially claimed that his car had been stolen while

28   he slept.   However, after a few days, Archan became frightened by

28

Petitioner's driving by his house and calling him; Archan felt that if he did not talk to police, something would happen to him. Archan admitted to a detective that he was with Petitioner when Petitioner killed Gonzalez.  Initially Archan faced the same charges as Petitioner, which carried life in prison without the possibility of parole.  However, Archan pled guilty to a felony charge of being an accessory to a crime, and he served a three-year maximum sentence pursuant to a plea agreement which required Archan to testify truthfully in Petitioner's prosecution.

Archan's brother testified that shortly after the murder, Archan told him that Petitioner was the one who set the car on fire, and that Archan put his clothes in a bag that was burned when the vehicle was burned.

Significant corroborating evidence was introduced at trial. Petitioner told the police that, shortly before the murder, he and Archan picked up Gonzalez and went to the Licon house, where Gonzalez walked away after arguing with Petitioner.  Petitioner also stated Archan would not commit such a crime as the murder.

A school bus driver discovered Gonzalez's body at about 6:30 a.m. on September 22, 2004, lying on the side of the road at the intersection of Lincoln and Indianola Avenues.  Fresh drag marks started from the north side of Lincoln Avenue and ended where the body was located, indicating that the body was moved from one location to its final resting place; broken glass, which appeared to be from an automobile, was found where the drag marks started. There were tire tracks and a wet spot.  There were two shoe tracks at the scene, one bearing a Nike logo and the second an athletic shoe impression which was similar to a shoe track found

at the site of Archan's burned vehicle.

An autopsy revealed that Gonzalez, who was three to four months pregnant, suffered one shotgun wound to the chest that perforated the left lung and the left atrium of the heart, shot from a distance of about three feet; another wound in the middle of the chest, which damaged most of the heart and the fourth and fifth vertebrae in the back, shot from about three feet; and a wound to the outside of the left elbow which shattered the humerus and indicated the shot was fired from a distance of about six feet. Gonzalez also suffered abrasions, including scraping injuries on the top of her left foot, left big toe, and back, consistent with her feet being wedged into the back of a seat, and with being dragged while on her back. There was also an injury to the nose consistent with being struck in the nose with the barrel of a sawed-off shotgun. Gonzalez died as a result of the wounds, and the fetus died as a result of the mother's death.

Gunshots were heard around 11:25 or 11:30 p.m. near the intersection on the night of September 21. Archan's car – which at 1:24 a.m. had been reported as having been stolen after 10:00 p.m. on September 21, 2004 – was discovered by law enforcement officers in a rural area of Kings County. The vehicle had been burned, and its tires were determined to have made the tire tracks located at the scene of the murder.

DNA testing established a 99.999 percent chance that the fetus's father was Robert Ruiz; neither Petitioner nor Archan was the father. Petitioner's brother had told Petitioner that Ruiz was the father of the unborn child, and Petitioner had appeared shocked. Two days before Gonzalez was murdered, Petitioner

pulled her by her hair to prevent her from entering her sister's
car.  On two other occasions, Gonzalez's sister observed
Petitioner accost Gonzalez, leave a red mark on her face, and
pull her hair and hit her.  Others had observed additional,
similar acts of violence.

Several witnesses corroborated various aspects of Archan's
testimony, including the Licon brothers, who saw Petitioner
around 10:00 p.m. at their home, fell asleep, and awakened at
midnight or between midnight and 1:00 a.m., when Petitioner and
Archan were making loud noises and Archan was using the
telephone.  One of the Licon brothers heard Petitioner tell
Archan that the latter should report his car as stolen; it was
known that Petitioner owned a double barrel shotgun.  One of the
brothers gave Petitioner and Archan a ride home in the morning.

Two prisoners housed with or adjacent to Petitioner in the
jail testified that Petitioner admitted to shooting Gonzalez.
Petitioner told one of them, who appeared to be a friend of Ruiz,
that he did so because Gonzalez was pregnant with Ruiz's child.
Because of their cooperation, both prisoners received substantial
reductions in the charges and terms they faced.

Petitioner presented two experts at trial.  A pathologist
generally agreed with the autopsy results but opined that the
wound to the arm was caused by a gunshot no more than six feet
from Gonzalez inflicted when the shooter was outside of the
vehicle and Gonzalez was inside.  The shotgun was probably one
and one-half feet from her when the two wounds to the chest were
inflicted.  She could have been in the right rear passenger's
seat when shot, and the shooter could have been outside of the

vehicle on the passenger's side; however, the expert believed

this to be an unlikely scenario based on his common-sense

understanding of people's reaction when a gun is pointed at them,

although it was impossible to predict.  Another forensic expert

testified he did not think it was likely that the bruising on the

foot was caused by Gonzalez's hooking her feet under the seat to

avoid being dragged out of the vehicle.  It was possible,

however, that the victim could have been sitting in the rear

passenger's seat with the shooter positioned outside the

passenger door when she was shot in the arm, just as Archan

testified.  It was also possible that the injuries could have

occurred with Gonzalez and the shooter in different positions.

(LD 2, 2-9.)

### 3.   Analysis

It must be determined whether petitioner's purported

evidence of innocence "'undermine[s] the entire prosecution case

and point[s] unerringly to innocence or reduced culpability.'"

In re Clark, 5 Cal.4th at 798 n.33.

The asserted absence of evidence to corroborate Petitioner's

connection to the murder is not supported by the record.  In

addition to Archan's testimony, the record reflects substantial

physical and forensic corroborating evidence, the observations of

multiple persons who observed Petitioner and Archan on the night

of the murder, Petitioner's own statements to law enforcement

officers and to fellow prisoners, and propensity evidence.  The

degree of corroboration in the record does not even suggest, let

alone demonstrate, that Petitioner is actually innocent of the

crime.

1    Petitioner emphasizes that defense photographs of the burned

2    vehicle suggest that there was evidence in the car, such as

3    clothing or a bag, which contradicted the declarations of law

4    enforcement officers who found no evidence other than glass.

5    However, even if that were true, Petitioner has not suggested

6    how, in light of the abundance of evidence supporting

7    Petitioner's guilt of murder, it could constitute irrefutable

8    evidence of innocence of the offense or the degree of the offense

9    of which Petitioner was convicted.  Even Petitioner's own experts

10   substantially conceded that the prosecution's shooting scenario

11   was possible.

12       Finally, Petitioner's willingness to testify under oath that

13   he is innocent does not suffice to establish actual innocence.

14   The precise substance of any such testimony is not set forth.

15   However, a contradictory version of the pertinent facts would not

16   undermine the entire prosecution case or point unerringly to

17   innocence or reduced culpability.  It would, at most, merely

18   conflict with trial evidence, and, in light of the overwhelming

19   evidence of Petitioner's guilt, would constitute evidence that a

20   reasonable jury could have rejected.  It thus would not be

21   sufficient to establish actual innocence.  <u>In re Clark</u>, 5 Cal.4th

22   at 798 n.33.

23       Petitioner has not shown that any evidence of innocence that

24   Petitioner could testify to could not have been, and presently

25   cannot be, refuted.  <u>Id.</u>  Accordingly, the Court concludes that

26   he did not establish actual innocence sufficient to constitute an

27   exception under state law to California's untimeliness rule.

28   ///

1    In sum, Petitioner did not justify with a showing of good

2   cause the 263-day delay after the CCA's denial of his petition on

3   February 17, 2011, and the filing of his petition in the CSC on

4   November 8, 2011.  Further, Petitioner did not establish actual

5   innocence, as defined by California law, as an exception to

6   California's untimeliness bar.

7    Accordingly, the Court concludes that the limitation period

8   began to run again on February 18, 2011 – the day after the CCA

9   denied Petitioner's habeas petition.  Petitioner's petition was

10  filed here on January 27, 2012, long after the expiration of the

11  few days remaining of the one-year statutory period.

12   VII.   <u>Equitable Exception of Actual Innocence</u>

13    In his supplemental opposition (denominated a motion to

14  vacate), Petitioner declared under penalty of perjury that he had

15  witnessed unspecified agents of the prosecutor, police, and

16  defense counsel for Petitioner and his co-defendant "knowingly

17  coerce" his co-defendant with a bribe of a plea deal to offer

18  perjured testimony against Petitioner to secure the tainted

19  conviction and sentence challenged in Petitioner's petition.

20  Further, unspecified trace evidence in "the vehicle related to

21  this case" was deliberately and knowingly destroyed pursuant to

22  the direction of detectives and Petitioner's defense counsel to

23  strip him of an available defense that could have proved there

24  was no evidence of an overt act on Petitioner's part or evidence

25  connecting him to the murder of the victim.  (Doc. 18, 3.)

26    The question of whether a showing of actual innocence will

27  bring a petitioner within an exception to the statute of

28  limitations, and the related question of whether a petitioner

34

claiming actual innocence must have exercised reasonable
diligence in raising his claim, are presently pending before the
United States Supreme Court.  See, McQuiggin v. Perkins, 670 F.3d
665 (6th Cir. 2012), cert. granted, McQuiggin v. Perkins, 2012 WL
3061886 (No. 12-126, U.S., Oct. 29, 2012).  Although the Supreme
Court has not yet decided whether actual innocence is an
exception to AEDPA's statute of limitations, the Ninth Circuit
Court of Appeals has held that a credible claim of actual
innocence constitutes an equitable exception to AEDPA's statute
of limitations such that a petitioner who makes such a showing
may have his otherwise time-barred claims heard on the merits.
Lee v. Lampert, 653 F.3d 929, 932 (9th Cir. 2011).[7]  The
exception extends only to a "'narrow class of cases...
implicating a fundamental miscarriage of justice' because a
'constitutional violation has probably resulted in the conviction
of one who is actually innocent.'"  Id. at 937 (quoting Schlup v.
Delo, 513 U.S. 298, 314-315 (1995) (internal quotation marks
omitted)).

    The evidence of innocence must be "'so strong that a court
cannot have confidence in the outcome of the trial unless the
court is also satisfied that the trial was free of nonharmless
constitutional error.'"  Id. (quoting Schlup, 513 U.S. at 316).
The "'petitioner must show that it is more likely than not that
no reasonable juror would have convicted him in the light of the
new evidence.'"  Id. at 938 (quoting Schlup, 513 U.S. at 327).

---

    [7] The Ninth Circuit did not decide what diligence, if any, a petitioner
must demonstrate in order to qualify for the actual innocence exception.  Id.
at 934 n.9.

1   <u>Schlup</u> requires a petitioner "'to support his allegations of
2   constitutional error with new reliable evidence—whether it be
3   exculpatory scientific evidence, trustworthy eyewitness accounts,
4   or critical physical evidence—that was not presented at trial.'"
5   <u>Lee v. Lampert</u> at 938 (quoting <u>Schlup</u>, 513 U.S. at 324).  The
6   habeas court then considers all the evidence, both old and new,
7   and incriminating and exculpatory, and makes a probabilistic
8   determination about what reasonable, properly instructed jurors
9   would do.  <u>Id.</u> at 938.  A petitioner need not affirmatively prove
10  innocence or demonstrate absolute certainty about the
11  petitioner's guilt or innocence; it is sufficient to cast doubt
12  on the conviction by undercutting the reliability of the proof of
13  guilt.  <u>Id.</u>  Unlike analysis of the sufficiency of the evidence
14  under <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), in determining
15  actual innocence, the credibility of witnesses may need to be
16  assessed; further, the mere existence of sufficient evidence to
17  convict is not determinative.  <u>Id.</u> at 938 n.13 (noting that the
18  <u>Schlup</u> standard incorporates the standard of proof of <u>Murray v.</u>
19  <u>Carrier</u>, 477 U.S. 478 (1986)).  Instead, a federal court must
20  assess how reasonable jurors would react to the overall, newly
21  supplemented record.  <u>Id.</u>

22      Here, the evidence of actual innocence that Petitioner
23  offers includes Petitioner's generalized allegations of official
24  coercion and bribery of Archan, and the alleged loss of trace
25  evidence in the vehicle that allegedly stripped Petitioner of an
26  available defense that could have proved there was no overt act
27  on the part of Petitioner or evidence connecting him to the
28  murder of the victim.

None of the matters that Petitioner offers has been shown to
constitute new evidence or matter that could not have been
presented at trial.  Further, Petitioner's allegations of having
witnessed coercion and bribery of his "co-defendant," (doc. 18 at
3), which the Court understands as a reference to Archan, to give
perjured testimony are too general and conclusional to undercut
the trial evidence.  Petitioner does not identify the persons
involved except by function (prosecutor, police, defense
counsel), and he provides no details concerning the time, place,
or other particulars of any alleged coercion.

Petitioner refers to the "bribe of a plea deal." (Id.)
However, trial jurors were presented with evidence of Archan's
extremely favorable plea agreement for a maximum prison term of
three years for being an accessory and his probable release after
testifying, as well his previous inconsistent statements to
detectives and his fear of Petitioner.  (LD 2, 6.)  The trial
jury thus considered essentially the same bases for challenging
Archan's credibility as Petitioner now offers.  Petitioner does
not offer any additional matter that would render it more likely
than not that no reasonable juror would have convicted him in
light of it.

With respect to Petitioner's contention that trace
exculpatory evidence in the vehicle was deliberately destroyed
on the order of unnamed detectives and his defense counsel,
Petitioner has not established what the evidence would have shown
or that the evidence was exculpatory in any sense.  In light of
the multiple items of circumstantial evidence in the record that
tend to establish Petitioner's guilt, Petitioner does not explain

37

how evidence that might have been found in the car would have proved that there was no evidence connecting Petitioner to the murder.  Indeed, it is difficult to understand how the multiple sources of evidence tending to show Petitioner's connection to, and involvement in, the crime could be undercut by physical evidence in the car.

Petitioner argues that evidence that was destroyed with the car stripped him of an available defense that could have proved there was no evidence of an overt act on Petitioner's part, which apparently means that the destroyed evidence could have shown that Petitioner was not the shooter.  However, Petitioner's own experts conceded that the prosecution's scenario was possible. (See, e.g., XXI RT 4472.)

Petitioner's fire expert testified that he had observed in a photograph visible traces of shoes and a bag handle in the layers of ashes remaining in the car.  However, a law enforcement officer testified that upon examining the contents of the car and sifting through them, he discovered no lead, shotgun shot or pellets, or signs of shotgun damage.  (XIV RT 2801; XV RT 2905-10.)  William Patrick O'Brien, an identification technician who investigated the scene and the burnt vehicle on behalf of the sheriff's department, testified he sifted through the interior ashes of the car and found no clothing, shotgun, shotgun shot, shotgun pellet or shell residue, scarring, or shotgun shot damage inside the car.  (XIV RT 2618 2649, 2759-63, 2767-68, 2779-88.)[8]

---

[8] O'Brien signed a declaration stating that he had examined the burnt car at the scene of the burning, but that was not true; before signing the declaration, he had read it, but he had misread the specific portion of the declaration, which had been prepared by someone else.  (XIV RT 2688-91.)

1  The jury was informed that Petitioner's former counsel, the
2  public defender, had access to the vehicle and the evidence
3  inside of it, and the car was dismantled and destroyed after
4  inspection and upon agreement of both the defendant's prior
5  counsel and the People.  (XXI RT 4921; XXI RT 4444.)

6      The Court concludes that Petitioner has not presented any
7  evidence beyond what was already presented to the jury, which
8  considered any conflict in the evidence concerning the contents
9  and treatment of the car.  He has not undercut the reliability of
10 the proof of guilt or shown that it is more likely than not that
11 no reasonable juror would have convicted him in the light of any
12 new evidence.

13     Petitioner has not met his burden of showing actual
14 innocence under the applicable standard.  Accordingly, the court
15 concludes that Petitioner has not shown that the statute should
16 be equitably tolled on the basis of the equitable exception of
17 actual innocence.

18     In sum, the statute of limitations began running on April
19 15, 2009.  On April 8, 2010, only six days before the expiration
20 of the limitation period, a period of statutory tolling commenced
21 with the filing of the petition in the FCSC.  The statute was
22 tolled until February 17, 2011, when the CCA denied Petitioner's
23 habeas petition.  The statute began to run again on the following
24 day, and the six days left of the statutory period expired long
25 before Petitioner filed his petition in the CSC on November 8,
26 2011, 263 days after the CCA's denial.

27     Accordingly, Petitioner's federal petition, filed on January
28 27, 2012, was untimely filed.  Thus, it will be recommended that

1  Respondent's motion to dismiss the petition as untimely be

2  granted.

3      VIII.   <u>Certificate of Appealability</u>

4      Unless a circuit justice or judge issues a certificate of

5  appealability, an appeal may not be taken to the Court of Appeals

6  from the final order in a habeas proceeding in which the

7  detention complained of arises out of process issued by a state

8  court.  28 U.S.C. § 2253(c)(1)(A); <u>Miller-El v. Cockrell</u>, 537

9  U.S. 322, 336 (2003).  A certificate of appealability may issue

10 only if the applicant makes a substantial showing of the denial

11 of a constitutional right.  § 2253(c)(2).  Under this standard, a

12 petitioner must show that reasonable jurists could debate whether

13 the petition should have been resolved in a different manner or

14 that the issues presented were adequate to deserve encouragement

15 to proceed further.  <u>Miller-El v. Cockrell</u>, 537 U.S. at 336

16 (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)).  A

17 certificate should issue if the Petitioner shows that jurists of

18 reason would find it debatable whether the petition states a

19 valid claim of the denial of a constitutional right or that

20 jurists of reason would find it debatable whether the district

21 court was correct in any procedural ruling.  <u>Slack v. McDaniel</u>,

22 529 U.S. 473, 483-84 (2000).

23     In determining this issue, a court conducts an overview of

24 the claims in the habeas petition, generally assesses their

25 merits, and determines whether the resolution was debatable among

26 jurists of reason or wrong.  <u>Id.</u>  It is necessary for an

27 applicant to show more than an absence of frivolity or the

28 existence of mere good faith; however, it is not necessary for an

1  applicant to show that the appeal will succeed.  Miller-El v.
2  Cockrell, 537 U.S. at 338.

3      A district court must issue or deny a certificate of
4  appealability when it enters a final order adverse to the
5  applicant.  Rule 11(a) of the Rules Governing Section 2254 Cases.

6      It does not appear that reasonable jurists could debate
7  whether the petition should have been resolved in a different
8  manner.  Petitioner has not made a substantial showing of the
9  denial of a constitutional right.  Accordingly, it will be
10 recommended that the Court decline to issue a certificate of
11 appealability.

12     IX.  Recommendations
13     Accordingly, it is RECOMMENDED that:

14     1) Petitioner's motion to vacate a judgment be DISREGARDED
15 except as supplemental opposition to Respondent's motion to
16 dismiss the petition; and

17     2) Respondent's motion to dismiss the petition be GRANTED;
18 and

19     3) The petition be DISMISSED with prejudice as untimely
20 filed; and

21     4) Judgment be ENTERED for Respondent; and

22     5) The Court DECLINE to issue a certificate of
23 appealability.

24     These findings and recommendations are submitted to the
25 United States District Court Judge assigned to the case, pursuant
26 to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of
27 the Local Rules of Practice for the United States District Court,
28 Eastern District of California.  Within thirty (30) days after

being served with a copy, any party may file written objections
with the Court and serve a copy on all parties.  Such a document
should be captioned "Objections to Magistrate Judge's Findings
and Recommendations."  Replies to the objections shall be served
and filed within fourteen (14) days (plus three (3) days if
served by mail) after service of the objections.  The Court will
then review the Magistrate Judge's ruling pursuant to 28 U.S.C.
§ 636 (b)(1)(C).  The parties are advised that failure to file
objections within the specified time may waive the right to
appeal the District Court's order.  Martinez v. Ylst, 951 F.2d
1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:     January 9, 2013           /s/ Sheila K. Oberto**
                                  UNITED STATES MAGISTRATE JUDGE